1

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3    PIERRE HODGINS,               )
                                    )
 4          Plaintiff,              )
                                    )
 5      vs.                         )  No. 1:02-CV-1454
                                    )
 6    CARLISLE ENGINEERED           )
      PRODUCTS, INC., et al.,       )
 7                                  )
            Defendants.             )
 8

 9

10                 A P P E A R A N C E S

11    .  VIA VIDEO CONFERENCE:
              D. DAVID ALTMAN COMPANY
12            BY:  D. David Altman, Esquire
              12 East Eighth Street, Suite 200
13            Cincinnati, Ohio  45202
              513-721-2180
14                 Attorneys for Plaintiff;

15       VIA VIDEO CONFERENCE:
              VORYS, SATER, SEYMOUR & PEASE
16            BY:  Marcel C. Duhamel, Esquire
              2100 One Cleveland Center
17            1375 East Ninth Street
              Cleveland, Ohio  44114-1724
18            216-479-6100
                   Attorneys for Defendants.

19

20            DEPOSITION OF PETER THORNE, M.S., PH.D.,

21    taken pursuant to notice and agreement of the
      parties, at the University of Iowa, 23 Lindquist
22    Center South, Video Conference Room, Iowa City, Iowa,
      on June 6, 2006, commencing at 9:15 a.m., before
23    Tammy Jones, Certified Shorthand Reporter in and for
      the State of Iowa.

24

25
```

ORIGINAL

```
 1                          INDEX

 2                         Witness

 3                PETER THORNE, M.S., PH.D.

 4
        Examination                           Page
 5
        Mr. Duhamel................................ 3
 6      Mr. Altman................................82

 7

 8

 9

10                         EXHIBITS

11      Thorne Exhibit                      Marked

12      Nos. 1 and 2.............................. 3
        No. 3....................................76
13

14

15

16

17

18

19

20

21

22

23      Certificate of Court Reporter.............85

24

25
```

1              J U N E   6 ,   2 0 0 6

2                   (Thorne Exhibits 1 and 2 were marked

3      for identification.)

4                   PETER THORNE, M.S., PH.D.,

5        being first duly sworn, was examined and

6        testified as follows:

7                        EXAMINATION

8    BY MR. DUHAMEL:

9         Q.    Good morning, Dr. Thorne.

10        A.    Good morning.

11        Q.    My name is Marcel Duhamel.  I represent the

12   Defendants in this case in which I understand you

13   have proffered an expert opinion to the Plaintiffs.

14   Is that correct?

15        A.    Correct.

16        Q.    Doctor, we're taking this deposition by

17   video conference today, and as I'm sure you've

18   noticed, there seems to be a bit of a transmission

19   delay, maybe a couple of seconds.  So what I'm going

20   to ask is, after I ask a question, if you would pause

21   for a moment before you begin to answer it to ensure

22   that I have finished speaking and to give your

23   Counsel a chance to object, if he feels it's

24   appropriate you do that.  Is that okay?

25        A.    Yes.

1        Q.   And I'm going to do my best to pause before

2   I begin speaking after you finish a sentence, so that

3   I avoid speaking over you.  All right?

4        A.   Fine.

5        Q.   If at some point I should speak over you,

6   please let me know.  Raise your hand or do something

7   to indicate that I interrupted you, because I do not

8   intend to do that, and I do want you to be able to

9   answer every question fully.  Okay?

10      A.   Yes.  And I will also do my best not to

11  interrupt you.

12      Q.   Fair enough.  Thank you.

13        Doctor, I gather you have testified before;

14  is that correct?

15      A.   Yes.

16      Q.   Very briefly, as I'm sure you're aware, the

17  court reporter is taking down what we say.  It would

18  be helpful if you would confine your responses to

19  verbal responses, rather than shrugs of the shoulders

20  or statements like "uh-huh" or "huh-uh."  Is that all

21  right?

22      A.   Yes.

23      Q.   If I ask you a question and you do not know

24  the answer, an "I don't know" is, of course, a

25  perfectly accepted response.  All right?

1    A.   Yes.

2    Q.   And, of course, if you don't remember the

3    answer, simply tell me, "I don't remember," and

4    that's also perfectly acceptable.  Okay?

5    A.   Right.

6    Q.   If I ask a question, as is likely, that you

7    don't understand, please do not answer it until you

8    ask me to rephrase it and I have articulated the

9    question in a way that you understand.  Is that fair?

10   A.   That's fair.

11   Q.   If you do answer a question that I've

12   asked, the record will assume that you understood it

13   and you intended to answer it the way you answered

14   it.  Is that fair?

15   A.   Yes.

16   Q.   Doctor, are you taking any medication, or

17   do you have any medical condition that would impair

18   your memory or your ability to concentrate or to give

19   accurate testimony today?

20   A.   No.

21   Q.   Doctor, before the deposition began, we

22   marked Exhibit 1.  Could you locate that and tell me

23   what it is?

24   A.   Exhibit 1 is an expert report that I

25   prepared for the purposes of this case.

1     Q.    I would like you to turn to Page 2 of

2    Exhibit 1.   I should have thought of this before we

3    marked it, but I didn't.   Is Page 2 the substitute

4    page that you sent after preparation of the report?

5         A.    In the report that's marked Exhibit 1, the

6    Page 2 is as originally submitted, and then affixed

7    to the end of it is the substitute Page 2 that was

8    submitted after the initial report.

9         Q.    Okay.   When did you submit the substitute

10   page to your -- to Counsel for the Plaintiffs?

11        A.    I'm not certain of the date, but it was

12   perhaps within two months of the initial submission.

13   I could check that date for you, if you would like.

14        Q.    Well, let's put it this way.   What caused

15   the substitution?   Did you notice that something

16   needed to be changed to your report?

17        A.    In reexamining the report subsequent to the

18   initial, when I came back to the report and in

19   discussions I was having about the content of my

20   report and the case, it was noted both by me and by

21   one of the associates in Dr. Altman -- or

22   Mr. Altman's firm that under B it was a bit ambiguous

23   the way I had initially written it.   And so I simply

24   offered to clarify that language when it was pointed

25   out to me that it was not as clear as it could have

1    been.  So to answer, I noticed the problem in

2    discussions with it, and I offered to put in a

3    substitute page, and I subsequently did so.

4         **Q.   Could you summarize for me what the**

5    **material differences are between the substitute page**

6    **and the original page?**

7         A.   Yes.  It's very simple.  The substitute

8    page describes what is known as a DNAPL, and the

9    initial page did not mention DNAPLs as a class of

10   chlorinated solvents or a designation of chlorinated

11   solvents.

12             MR. ALTMAN:  Marcel, Dave Altman.

13             MR. DUHAMEL:  Yes.

14             MR. ALTMAN:  Could you read back --

15   could the court reporter read back what Dr. Thorne

16   said?  I was interrupted by my office asking about

17   those exhibits -- and just the part where you asked

18   him the question, why did you make the changes or

19   whatever that question was?

20             (The reporter read the requested

21   portion of the record.)

22             MR. ALTMAN:  Thank you.

23        **Q.   (BY MR. DUHAMEL)  Doctor, is the language**

24   **under Paragraph B before Item B(1) the only language**

25   **that changed in your report?**

1       A.    Yes.

2       Q.    **Prior to the deposition, we marked**

3   **Exhibit 2.  I would like you to locate this and**

4   **identify it for me, if you would.**

5       A.    Exhibit 2 is a copy of my Curriculum Vitae

6   submitted at the time I was contacted about serving

7   as an expert in this case.

8       Q.    **I notice it indicates that it was prepared**

9   **on August 18, 2005.  Is that accurate?**

10      A.    Yes.

11      Q.    **Have there been any significant changes or**

12  **additions to your Curriculum Vitae since the date on**

13  **which you prepared Exhibit 2?**

14      A.    There are five subsequent Curriculum Vitaes

15  since this time as it's constantly being updated to

16  reflect additional teaching, new grant support and

17  further publications.  It's an ongoing process.

18      Q.    **Are you able, sitting here today, to**

19  **identify for me the additional publications since**

20  **August 18, 2005?**

21      A.    No.  And the reason is that there -- I

22  typically have about 16 -- 10 to 16 publications per

23  year at this point in my career, and I can't offer

24  those full citations off the top of my head.  I'd be

25  happy to provide them for you.

9

```
 1          Q.    Well, that's reasonable, and I will ask

 2     that you provide them, if you would be willing to do

 3     so.

 4          A.    Certainly.

 5          Q.    Doctor, your Curriculum Vitae --

 6                    MR. ALTMAN:  Peter --

 7                    THE WITNESS:  Yes.

 8                    MR. ALTMAN:  You provide those to me,

 9     and we will provide them to Marcel.

10                    THE WITNESS:  I understand.

11          Q.    (BY MR. DUHAMEL)  Doctor, if you could turn

12     to Page 51 of your Curriculum Vitae?

13          A.    (Pause.)

14                Okay.

15          Q.    Beginning on Page 51 and continuing onto

16     Page 52, there is a list under the subject

17     Professional Consulting or Services as Expert

18     Witness.  Do you see that list?

19          A.    Yes.

20          Q.    Is that list up to date?

21          A.    Yes.

22          Q.    There are a few entries on this list I'd

23     like to ask you some specific questions about.  The

24     first one is on Page 52, and it shows a range from

25     1997 to 1999, and it indicates Altman & Calardo Co.,
```

1    Cincinnati, Ohio.  Do you see that?

2        A.    Yes.

3        Q.    Can you describe for me the services that

4    you were providing under that entry?

5        A.    Yes.  I served as an advisor on some legal

6    matters as well as serving as an expert on a case

7    during that time.

8        Q.    Which case did you serve as an expert on

9    during that time?

10       A.    (Pause.)

11            I'm pausing to see if I can remember the

12   name of the case.

13            (Pause.)

14            I don't remember the name of the case at

15   this point.

16       Q.    Do you recall if he represented a plaintiff

17   or a defendant?

18       A.    I don't remember which case it was, so I

19   don't know.

20       Q.    It also said you provided some consulting

21   in addition to the expert testimony; is that correct?

22       A.    Yes.

23       Q.    Could you describe what you meant by that?

24       A.    My recollection is that at that time, there

25   were some legal matters that Mr. Altman would contact

1    me about from time to time and ask for some expertise

2    in toxicology in terms of matters that he was

3    considering.

4         Q.    You did not provide expert reports as a

5    result of those consultations?

6         A.    No.

7         Q.    Okay.  A few entries down, there's another

8    entry, 2000 to 2006, D. David Altman Co., Cincinnati,

9    Ohio.  Do you see that?

10        A.    Yes.

11        Q.    First of all, is the D. David Altman in

12   that entry the same as the Altman in the entry we

13   were discussing a moment ago?

14        A.    Yes.

15        Q.    Could you describe for me the work that you

16   did with respect to that second entry?

17        A.    The work was similar to what we just

18   described in terms of occasionally answering

19   questions that he would pose regarding matters of

20   toxicology interest, and in addition to that, I

21   served on one case as an expert witness where I

22   offered a deposition.

23        Q.    Which case was that?

24        A.    It was a case referred to as Cornett versus

25   Welding Alloys, Incorporated.

1    Q.    And that's reflected on your CV; is that

2    correct?

3    A.    Yes, it is.

4    Q.    At what page?

5    A.    It's Exhibit 1, Page 11.  I'm sorry.  Did

6    you say "CV"?  It's in my report, which is Exhibit 1.

7    Q.    Okay.  All right.  It's not on your CV, per

8    se, but it is on Exhibit 1; is that correct?

9    A.    Correct.

10    Q.    Okay.  What kind of case was that?

11    A.    Can you clarify what you mean by "what kind

12    of case"?

13    Q.    Do you recall what the issues in that case

14    were?

15    A.    Yes, I do.  There was --

16    Q.    What were those issues?

17    A.    The case involved a manufacturing facility

18    that was adjacent to a property, and there were

19    concerns among the owners of that property of

20    materials coming from the manufacturing facility to

21    their property and the fact that there wasn't proper

22    notification to responsible authorities with regard

23    to environmental regulations -- environmental

24    regulations, and there was also concern about the

25    contaminants causing adverse health effects among

13

1    residents living in that vicinity.

2        Q.    If I understand correctly, you were deposed

3    in that case?

4        A.    Yes.

5        Q.    Do you recall the substance of the opinion

6    you rendered in that case?

7        A.    My recollection is that I offered specific

8    information about the toxicologic properties of the

9    materials that were in use at that facility and

10   materials that were identified off site from that

11   facility on adjacent properties.

12       Q.    Did you render any opinion in that case as

13   to whether any individual in fact had suffered any

14   adverse health effect as a result of exposure to any

15   substance?

16       A.    There were medical experts involved with

17   that case that offered medical opinions regarding the

18   health consequences of exposures.  I was offering

19   expert opinion on the toxicologic properties of those

20   materials and their movement via aerosol transport.

21       Q.    So if I understand correctly -- and please

22   tell me if this is not correct -- you were not

23   expressing any opinion as to whether anyone had been

24   exposed to those chemicals or had suffered an adverse

25   effect as a result of the exposure, but, instead,

1    were expressing an opinion as to what the potential

2    toxicological effect of exposure could be?

3         A.    I was offering an opinion both regarding

4    the toxicologic properties and their effects and

5    transport of materials via aerosol transmission, so

6    that would be an exposure pathway.  I did not examine

7    the patients, nor did I offer a medical opinion based

8    on examining a patient.

9         Q.    How were the substances at issue in that

10   case transported off the site of the manufacturer?

11        A.    One of the principal manners by which the

12   materials were transported off site was via air

13   emissions from the facility that were coming from a

14   variety of industrial processes at that facility, and

15   that was the area that I was primarily concerned with

16   from a toxicologic standpoint.

17        Q.    Did you address, in the opinion you

18   rendered in that case or in your testimony, transport

19   through groundwater?

20        A.    No, I don't believe so.

21        Q.    Did you end up testifying at trial in that

22   matter?

23        A.    I did not.

24        Q.    There is one entry on Page 11 of Exhibit 1

25   above Cornett versus Welding Alloys.  That's Sherlock

1    **Homes versus Margaret Nims.  Do you see that?**

2         A.    Yes.

3         Q.    **First of all, was that trial testimony or**

4    **deposition testimony or both?**

5         A.    Trial testimony.

6         Q.    **Had you been deposed in that matter?**

7         A.    No.

8         Q.    **Who retained you to testify in that case?**

9         A.    The firm representing a business referred

10   to as Sherlock Homes.

11        Q.    **What was the nature of the dispute, if you**

12   **recall?**

13        A.    Sherlock Homes is a company that sells

14   manufactured housing.  And they had entered into a

15   contract with Mrs. Nims to purchase a dem- -- a demo

16   or a lot model of a manufactured home, which was then

17   delivered to her and put on the property that she had

18   so designated.  She then refused to pay for that

19   delivery and for the home on the basis that she felt

20   she was exposed to formaldehyde from that home.  And

21   she had not understood that there were warnings

22   placed about formaldehyde exposure, and there was

23   debate within the trial over whether or not she was

24   made aware of that properly or not.  And as I

25   understood it, the company was seeking payment for

1    delivery of that home and for a portion of its use.

2       **Q.   What was the nature of your testimony in**

3    **that case?**

4       A.   I testified with regard to the potential

5    health effects of formaldehyde exposure, formaldehyde

6    exposures typically seen in manufactured housing over

7    time, industry standards regarding the manufacture of

8    plywood and particle board with regard to

9    formaldehyde emission and formaldehyde exposures

10   among people who smoke cigarettes.

11       **Q.   Was the defendant in this case a smoker?**

12       A.   Yes.

13       **Q.   And did you express any substantive**

14    **opinions through your testimony?**

15       A.   Yes, I did.  I expressed the opinion that

16   this particular manufactured home, having been on the

17   lot for about a year's time, would have off-gassed

18   formaldehyde and would have a lower amount of

19   airborne formaldehyde than would a newly-manufactured

20   home.  I also expressed the opinion that based on

21   published information and data available, generally,

22   that the exposures she would be likely to attain from

23   entering that home for one hour would be considerably

24   less than she would receive from smoking two packs of

25   cigarettes per day.

1      **Q.    Let me state this as a proposition and see**

2   **if you would agree with it based, at least in part,**

3   **on the description of the opinion that you rendered**

4   **in the Sherlock Homes case.   Would you agree that a**

5   **substance's potential toxicological impact on human**

6   **health depends, at least in part, on how the people**

7   **or person in question is exposed to the substance and**

8   **at what dose and over what period of time?**

9                    MR. ALTMAN:   Objection.

10       A.    Are you speaking generally, or are you

11   speaking specifically with regard to the Sherlock

12   Homes versus Nims case?

13       **Q.    I'm speaking generally.**

14       A.    Okay.  So we're not talking about --

15                    MR. ALTMAN:  Wait a minute, Peter.

16   Peter.

17                    THE WITNESS:  Yes.

18                    MR. ALTMAN:  Continuing objection.

19                    Go ahead.

20                    Continuing objection.

21                    Go ahead.

22       A.    So as I understand the question that you've

23   asked me, you've asked if -- are you referring to

24   exposure to a single compound, or are you referring

25   to exposure to an array of compounds in a complex

1    mixture?  Can you clarify that for me, please?

2        Q.    (BY MR. DUHAMEL)  Sure.

3            Let's start by asking the question with

4    respect to exposure to a single compound.

5        A.    Okay.  Such as perhaps --

6                MR. ALTMAN:  Continuing -- Peter,

7    pause.  Continuing objection.

8                Go ahead.

9        A.    Well, of course, exposures to an individual

10   compound are a very rare event in the real world and

11   when we're talking about exposures to people.  If

12   you're talking about perhaps a laboratory rat or a

13   laboratory mouse, where you can control everything

14   exposed to an individual substance, in some cases,

15   the route of exposure will make a difference, and in

16   some cases, it does not.  It will depend upon the

17   compound.  In the real world, where you have exposure

18   to complex mixtures with people who are not

19   genetically identical, there will be individual

20   susceptibilities.  There will be also -- which are

21   partially genetically determined.  Also,

22   susceptibility is determined by the age of the

23   individual, in some cases their gender, underlying

24   health problems.  And when they're exposed to an

25   array of compounds, exposure to one can certainly

19

1 affect the response to another.

2      **Q.   Have you ever published on that subject,**

3 **expressing that view?**

4      A.   Yes.

5      **Q.   Could you identify for me those**

6 **publications?**

7      A.   Well, the one that comes to mind first is a

8 textbook.  It's called -- it's referred to as

9 Casarett & Doull's Toxicology, "The Basic Science of

10 Poisons," and it's in its sixth edition, and I

11 published a chapter in that textbook on occupational

12 toxicology.  And in that chapter, I created a diagram

13 which indicates a pathway from exposure to response

14 and indicates underlying susceptibility factors and

15 the influence of co-exposures to agents.  There are

16 other examples in my publications over the years, but

17 that's perhaps the most direct.

18      **Q.   Other than the two pieces of testimony**

19 **history on Page 11 of Exhibit 1, have you provided**

20 **any other testimony as an expert witness in the last**

21 **five years?**

22      A.   No.

23      **Q.   How about in the last ten years?**

24      A.   I believe I was deposed in one other case

25 nearly ten years ago, and I'm afraid I don't remember

1    the particulars of that case, as I sit here now.

2        Q.   Do you know if you have ever testified on

3    behalf of a defendant?

4        A.   (Pause.)

5             I see that Mr. Altman is answering the door

6    here, so I'll pause a moment for him.

7             MR. ALTMAN:  Thank you very much.  I am

8    back at the table.

9        A.   Okay.  I will resume.

10            I have served as an expert for defendants.

11   I don't believe that I've been deposed in any of

12   those cases or given testimony at trial.

13       Q.   Did you say --

14            MR. ALTMAN:  Marcel, excuse me.

15            Peter, I'll instruct you to review with

16   both Counsel whether any information, unless you know

17   sitting there, can be provided on those cases where

18   you've been a consultant.  I don't want you to

19   prejudice whatever those matters are, and so I'm

20   going to ask you to be cautious concerning any

21   specific answers.

22            THE WITNESS:  Yes, I understand that.

23   Thank you.

24       Q.   (BY MR. DUHAMEL)  Doctor, are you able --

25   well, why don't we do it this way.  If you could look

1    at Pages 51 to 52, Exhibit 2?

2        A.    Yes.

3        Q.    If we could just go through the list, and

4    if you could identify for me, one at a time, which of

5    the entities -- or, rather, what you did for each of

6    those entities, I would appreciate it.

7        A.    Starting with 1982?

8        Q.    Yes, please.

9        A.    I may not be able to remember all of them,

10   but I will certainly do my best.

11            It begins with 1982, Union Carbide

12   Corporation.  I was a graduate student at the time,

13   and I worked with a professor.  And we were

14   considering the degradation of aldicarb in soil.

15            1982, Kikkoman Foods, Incorporated,

16   Walworth, Wisconsin.  This is a manufacturer of soy

17   sauce, among other things.  And they were interested

18   in creating a low-sodium soy sauce.  And so we

19   designed a process that would exchange potassium for

20   sodium, and I tested some of the materials that would

21   be used in that process for compliance with FDA

22   guidelines on materials that come in contact with

23   food.  And, again, that was under the guidance and

24   collaboration of a professor I was working with.

25            Union Carbide Corporation, 1983 to '87.

1    This was then a follow-up study on aldicarb

2    degradation in various types of soils, depending upon

3    whether they had bacteria in the soil or whether they

4    were sterile.

5            1985, Environmental Quality Associates.

6    This was some work done on an indoor air quality

7    problem, and I performed some analysis of samples.

8            1986 to 1987, Proctor & Gamble Company,

9    Cincinnati, Ohio.  I worked as a consultant to

10   Proctor & Gamble in their toxicology division.  They

11   were trying to set up an animal testing system for

12   looking at respiratory allergy.  I had developed such

13   a system in my post-doctoral studies at Pittsburgh,

14   and so I was setting up and troubleshooting a system

15   for them to use for their testing.

16           1988, Duquesne Light Nuclear Group,

17   Incorporated, Shippingport, Pennsylvania.  This was a

18   power generating facility that had an indoor air

19   quality problem with their ventilation system where

20   it was contaminated with microorganisms.  I

21   determined what the problem was and guided them on

22   solving their problem.

23           Emilcott Associates, Incorporated, Madison,

24   New Jersey, 1989.  This was a consulting firm, and

25   they were working in indoor air quality problems, I

1    believe.  And if I remember right, I analyzed samples

2    for them as part of one of their investigations of a

3    sick building.

4              1990, State of Iowa, Department of Natural

5    Resources.  In this case, I was involved with issues

6    having to do with permitting of facilities and how

7    modeling -- plume dispersion modeling would be used

8    in order to determine compliance with state law.

9         Q.   Can I interrupt for one second?

10        A.   Yes.

11        Q.   Going back to that, when you say you were

12   modeling plume dispersion, could you be more

13   specific?  What were you talking about?

14        A.   If I said I was modeling plume dispersion,

15   I apologize.  I don't think I said that.  What I was

16   doing was sitting on an expert panel that was helping

17   the State and the regulated community consider models

18   for plume dispersion modeling of facilities that

19   generated air pollution.  And as I recall, the issue

20   was which models that had been developed would be

21   acceptable for permitting purposes.  And so I was

22   part of an expert panel that was listening to that

23   and offering guidance on specific issues.

24        Q.   Thank you.  Please continue.

25        A.   Okay.  I believe I was at 1990,

24

1    S.C. Johnson & Sons, Incorporated, Racine, Wisconsin.

2    S.C. Johnson & Sons was concerned with issues of

3    allergy, allergic contact dermatitis specifically,

4    which is a contact allergy that one can attain from

5    certain types of consumer products that might be

6    applied to the skin, such as shampoos, cosmetics, in

7    some cases dermally applied medicine.  And they were

8    interested in having a way to test these in mice to

9    determine if perfumes, preservatives or other

10   components would induce toxic effects.  And I worked

11   with them to develop a mouse method for testing for

12   allergic contact dermatitis.

13          Allied Products Corporation, Chicago,

14   Illinois, 1990.  I'm not certain on this one.  I --

15   my recollection is that this may have been an injury

16   of an employee and a workplace evaluation, but I'm

17   not -- I don't recollect that one clearly anymore.

18          Iowa Beef Processors, Incorporated, was a

19   worker injury and consultation on that particular --

20   the circumstances that led to that injury.

21          1991, CNA Insurance Company was also a

22   worker injury case, and I offered some information

23   regarding the toxic properties of the compounds that

24   were under question.

25          Green Environmental Services, Cedar Rapids.

1   My recollection is, this had to do with using

2   railroad ties for landscaping and questions about the

3   properties of some of the materials that are used to

4   coat railroad ties.

5           1995, Habush, Habush, Davis & Rottier,

6   Madison, Wisconsin, is a law firm.  And they were

7   representing a firm that supplied hay to a dairy

8   farmer and asked for an opinion with regard to the

9   properties of microbial contaminants and micro-toxins

10  in green feed hay and so forth.

11          1995, Smith, McElwain & Wengart Law

12  Offices, Sioux City.  I don't remember this one at

13  all, I'm afraid to say, so I don't remember what that

14  was about.

15          1995, Castrol Industrial of North America.

16  They are a manufacturer of metalworking fluids which

17  are used for processing cast metal into finished

18  products, such as engine blocks and transmissions.

19  And I had done a number of research studies on the

20  health of machinists exposed to metalworking fluids.

21  And I was consulting with them on formulation of some

22  of their products.

23          We've talked briefly about the next entry,

24  '97 to '99.

25          1998, Hoogovens, Ijmuiden, The Netherlands.