1     This was a machining facility, a large machining

2     facility.  And they had a concern about machining

3     fluids that they were using in their processing and

4     microbial contaminants, and I spent one day with

5     them, consulting on their concerns.

6              Wausau Insurance, Downers Grove, Illinois,

7     1999.  This was a worker injury case or consultation,

8     rather, and I evaluated the toxic properties of the

9     compounds in question.

10             We've addressed the next entry already.  D.

11    David Altman Company.

12             2000, Shuttleworth & Ingersoll, P.C., Cedar

13    Rapids.

14             (Pause.)

15             I'm pausing to try to recollect what the

16    issue was there.  Oh, yes, I remember.  This was a

17    case of a furniture sales store that did some

18    refinishing of wood, and there was a worker with a

19    health concern regarding that.

20             2002, United States Department of Justice

21    and US EPA Air Enforcement Division.  This had to do

22    with my laboratory and me performing some analyses of

23    samples taken from large poultry confinement

24    facilities -- or taken in the vicinity of poultry

25    confinement facilities, and these were analyzed for

1    the airborne microorganisms in their products.

2              2003, Sullivan & Ward, Des Moines, Iowa, is

3    the case that we described, Sherlock Homes versus

4    Margaret Nims.

5              2005, White & Johnson, P.C., concerned an

6    indoor air problem and a dispute between the heating,

7    ventilating and air conditioning company that

8    installed the ventilation system and the homeowners.

9    And that's the complete list.

10        **Q.   Doctor, it seems to me, from hearing your**

11   **description of that list and from looking at the**

12   **publications on your Curriculum Vitae, that a great**

13   **deal of your work has been focused on airborne**

14   **exposures and in some cases contact exposures; is**

15   **that correct?**

16        A.   My published work, much of it is, indeed,

17   focused on pulmonary or immunotoxicology.  However, I

18   teach toxicology at the undergraduate and graduate

19   level, and I teach general environmental health, and

20   I teach environmental epidemiology, a variety of

21   subjects.  So I have expertise that is represented

22   more in my teaching that is broader than what is

23   represented in the particular areas where I am

24   currently actively doing research.  Within my

25   published record, I have also looked at pesticide

1   degradation and issues of the way toxic materials

2   behave in the environment.

3        Q.   Holding aside what you may teach, I want to

4   focus on your research and on your professional

5   consulting services.  Is it fair to say that the vast

6   majority of that has dealt with airborne exposures or

7   contact exposures?

8                MR. ALTMAN:  I'll object.

9                Go ahead, Dr. Thorne.

10       A.   Looking simply at my publication record,

11  which reflects my research, it spans an array of

12  areas, and the unifying feature is that it has to do

13  with toxic agents in the environment and the way that

14  they induce adverse health effects.  I think, put

15  that way, that encompasses the vast majority of the

16  work that I've done.

17       Q.   With all due respect, I'm not sure that

18  that actually answers my question, so perhaps I'll

19  put it this way instead.

20               MR. ALTMAN:  Objection.

21       Q.   Have you --

22               MR. ALTMAN:  Objection.

23               Go ahead.

24       Q.   Have you published on the subject of

25  exposure to toxic substances through groundwater?

1      A.   I have published on the toxic property of

2   substances that can move through groundwater.   Is

3   that your question?

4      **Q.   It is not.**

5      A.   Okay.

6      **Q.   Have you published on -- have you published**

7   **on the exposure to substances that, in the context of**

8   **what you were publishing on, were transported through**

9   **groundwater?**

10                MR. ALTMAN:   Objection.

11     A.   I'm going to look through the papers that

12  are listed and the abstracts and make sure that I

13  answer your question as best I can.   There's --

14  recognizing that it covers more than 20 years and

15  more than 200 published abstracts, papers and book

16  chapters.

17                (Pause.)

18                MR. ALTMAN:   Marcel, I want to make

19  clear my objection is to the form.   I don't

20  understand that question, but if the witness does, he

21  should certainly answer it.

22                MR. DUHAMEL:   The witness didn't seem

23  to have any problem understanding the objection --

24  or, rather, the question.

25                MR. ALTMAN:   I think the witness

1    already answered your question, and I have a problem

2    with the form of your -- also of your next question

3    that you now have, and so I've objected to form.  But

4    if the witness does understand what you're saying, he

5    should answer.

6         A.    (Pause.)

7              Looking at my record of publications as

8    reflected in Exhibit 2, I see that I have published

9    several papers that cover or consider issues of

10   substances that can move in water.  This would

11   include metalworking fluids and their components.  It

12   would include arsenic.  It would include several

13   other metals, and it would include some pesticides.

14        Q.    **It appears to me that perhaps we are having**

15   **a little difficulty communicating, so let me try to**

16   **narrow the focus of my question.  Okay, Doctor?**

17        A.    Please do.

18        Q.    **Holding aside your studies of materials**

19   **that can move through water, have you ever published**

20   **on the subject of the toxicological properties of**

21   **substances to which individuals were exposed through**

22   **contaminated groundwater?**

23        A.    Yes.

24              MR. ALTMAN:  Objection as to the form.

25   Objection as to the form.

1          Go ahead.

2     A.   Yes.

3     Q.   **And could you identify those publications**

4  **for me?**

5     A.   The publication listed as No. 102.

6     Q.   **And that is, just to be sure we're correct,**

7  **Beane Freeman LE, Dennis LK, Lynch CF, Thorne PS,**

8  **Just CL, Toenail arsenic content and cutaneous**

9  **melanoma in Iowa?**

10    A.   Cutaneous, yes.

11    Q.   **Thank you.**

12         **And that's correct?**

13    A.   That's correct.

14    Q.   **That's the publication to which you were**

15  **referring?**

16    A.   Yes.

17    Q.   **Any others?**

18         MR. ALTMAN:  Objection to form.

19    A.   As I understand the question, it's

20  exceedingly narrow.

21    Q.   **That is correct.  It's a very narrow**

22  **question, Doctor.**

23         THE WITNESS:  Can you repeat the

24  question for me?

25    A.   Am I allowed to ask the court reporter to

1    repeat the question?  I guess I should ask you,

2    Mr. Duhamel.

3          **Q.    That's fine.**

4                MR. DUHAMEL:  I'll ask the court

5    reporter to -- I'll ask the court reporter to read

6    the question back.

7                (The reporter read the requested

8    portion of the record.)

9                MR. ALTMAN:  I continue to object.

10               Go ahead.

11         A.    I can think of one additional study that

12   considered, among many other exposures, exposures to

13   contaminated water, and that would be No. 43 on

14   Page 13.

15         **Q.    Just to try to make sure our list is**

16   **complete, any others that you can recall?**

17         A.    So you're not interested in studies of

18   materials to which people are exposed to groundwater,

19   but that were conducted in a laboratory?  You're

20   excluding those, correct?

21         **Q.    Not intentionally.**

22         A.    Okay.  I can point to publication No. 11 on

23   Page 12, which is Lightfoot EN, et al., Laboratory

24   studies on mechanisms for the degradation of

25   aldicarb, aldicarb sulfoxide and aldicarb sulfone,

1    1987.

2              Similarly to that would be No. 32 on

3    Page 13, Subramanian, Teesch, Thorne, Degradation of

4    3.5-dimethyl-tetrahydro-2H-1,3,5-thiadiazine-2-thione

5    in aqueous aerobic media.

6         Q.    Let me ask, what is aqueous aerobic media?

7         A.    That means water-based solutions that have

8    oxygenation or air, and it makes a difference in

9    terms of degradation of compounds.

10             Also, there are studies in the waste

11   handling industry where people are exposed to

12   potentially infectious agents via ingestion.  So

13   although that's not groundwater, it's through

14   ingestion of food and water, and, hence, it's not

15   respiratory and it's not percutaneous absorption,

16   which was part of your initial question.

17        Q.    That's correct.  Could you identify those

18   for me?

19        A.    There is a paper, No. 66, on Page 15,

20   Mahar, Reynolds, Thorne, and it's entitled Worker

21   exposures to particulates, endotoxins and bioaerosols

22   in two refuse-derived fuel plants.  The title doesn't

23   necessarily reflect this, but we did look at

24   gastrointestinal illness among these particular

25   workers.

1          Then there's a paper now published that is

2     listed on Page 18, and it's No. 6 at the top of the

3     page, and at the time of this, it was a submitted

4     paper.  It is now published.  And that is Lee,

5     Johnson, Reynolds, Thorne, O'Shaughnessy, entitled

6     Indoor and outdoor air quality assessment of four

7     wastewater treatment plants.  And in that there's

8     also ascertainment of gastrointestinal illness as

9     part of the evaluation.

10         As I glance at the list of these

11    publications, those are the ones that come to mind as

12    examples.  There may be aspects of some of the other

13    papers as well.  For instance, there's also No. 94 on

14    Page 16 that considered women serving in the Gulf

15    War, the first Gulf War -- well, the first U.S. Gulf

16    War and their combat experience exposures and

17    utilization of health care, so that would also

18    consider the water that they ingested.

19         Q.   Could you look at Page 51 and 52 of

20    Exhibit 2 and do the same thing you just did with

21    respect to professional consulting and serving as

22    expert witness?

23         A.   Can you clarify what you mean by what I

24    just did?  I want to make sure I understand you.

25         Q.   Sure.

1              Could you identify -- that's fine.

2              Could you identify any of those engagements

3     which involved potential exposure to a substance

4     through either ingestion of or contact with

5     contaminated water?

6                   MR. ALTMAN:  Objection to the form.

7     Marcel, you have now changed it to potential

8     exposure, and that was not part of your first

9     question.  I don't know whether that was intentional

10    or not.

11       A.   So you're asking for potential exposure to

12    contaminated water, and any contaminant?

13       Q.   Correct, for this list that we're looking

14    at on Page 51 to 52, yes, where you actually

15    considered the effects of potential exposure or

16    actual exposure.

17       A.   So 1982 --

18                  MR. ALTMAN:  I want the record to

19    reflect that that is not the same question that was

20    asked on the earlier list.

21                  MR. DUHAMEL:  I think the record will

22    reflect whatever it reflects.

23       A.   1982, Union Carbide, that would -- that did

24    consider potential exposures to substances in the

25    water.

1          Kikkoman Foods also -- in this case it was

2     processed water used for manufacturing soy sauce.

3          1983 to '87, Union Carbide, same as what I

4     just -- as the previous Union Carbide that was

5     considering contaminants in water.

6          1988, Duquesne Light Nuclear Group.  This

7     was contaminants in water in the cooler condensing

8     units in the ventilation system, but they were

9     waterborne contaminants.

10          S.C. Johnson & Sons.  These were

11     contaminants in products that you use in the shower,

12     in some cases, so those would be water, but they

13     were -- exposure to those would mostly be by dermal

14     absorption; although, one can have some ingestion,

15     potentially.

16          Castrol Industrial of North America.

17     Metalworking fluids can be contaminants of water and

18     their products and their process oftentimes in

19     municipal wastewater treatment system which may not

20     adequately remove the contaminants from the water.

21          Q.   If I could interrupt you briefly.

22     Specifically, what were you looking at in the

23     engagement involving Castrol Industrial of North

24     America?

25          A.   I was -- the nature of that consultation

1    had to do with the formulation of machining fluids.

2    And the formulation includes what chemicals are put

3    into them in their initial formulation as well as

4    additives that are recommended.  It also deals with

5    compounds that arise in the use of those metalworking

6    fluids in industrial processes and then the

7    ramifications of the waste treatment and recovery of

8    those machining fluids, because they're very

9    expensive.  And oftentimes it is not allowed to have

10   certain contaminants or certain compounds included in

11   those put into the municipal sewer system.  I think

12   if I were to go any further than that, it would get

13   into trade secrets with regard to their formulary,

14   and so I can't do that.

15        Q.   All right.  And that's it on the list, the

16   ones you've already identified?

17        A.   Yes.

18        Q.   I interrupted you while we were talking

19   about Castrol, and I wanted to make sure there was

20   nothing subsequent to that.

21        A.   Well, the list, 1998, Hoogovens, Ijmuiden,

22   that was also machining fluids used in metal

23   processing, so those have the potential to lead to

24   ingestion exposure from water systems.

25        Q.   Were you specifically studying that

1   **potential exposure and its effects with respect to**

2   **that particular engagement?**

3               MR. ALTMAN:  Objection.

4       A.   When a company has a problem with a

5   material in a process, oftentimes one doesn't simply

6   look at one small aspect of the problem.  So I was

7   looking at a host of questions that they had

8   regarding these materials, their toxic properties and

9   how they could deal with cleaning them, reprocessing

10  them, reusing them and disposing of them.  So it was

11  an element of the overall consultation.  It wasn't

12  the sole aspect of the consultation.

13      **Q.   Doctor, let's turn to Exhibit 1.  When were**

14  **you first asked to prepare an expert report in this**

15  **case?**

16      A.   It was early in the fall of 2005.

17      **Q.   What specifically were you asked to express**

18  **an opinion on?**

19      A.   I was asked to consider the toxicants that

20  were at the Carlisle facility or emanating from the

21  Carlisle facility and provide information on their

22  toxicologic properties.

23      **Q.   Were you asked to do anything else?**

24              MR. ALTMAN:  Objection to form.

25      A.   I was also asked to identify and define

1    what sorts of criteria are used for establishing the

2    hazardous nature of compounds, for instance,

3    carcinogens.  And so I provided the group listings

4    from the National Toxicology Program and from the

5    International Agency for Research on Cancer and the

6    criteria that they use.

7            In addition, I provided some information,

8    where appropriate, on the degradation products that

9    arise from some of the toxicants that I was

10   expressing -- providing information about as to their

11   toxicity.  I also provided some information regarding

12   the hazards associated with exposures to mixtures

13   rather than individual compounds one at a time,

14   because, as I expressed earlier, that's really very

15   much of an artificial scenario that one might be

16   exposed to a compound one at a time, and so I

17   commented on the toxicity of mixtures as well.

18        Q.   **Were you asked to do anything else?**

19        A.   That's all I recall being asked to do.

20        Q.   **We're going to take a momentary break.**

21   **We've been going for about 90 minutes.  We'll**

22   **reconvene in two or three minutes, if that's okay.**

23        A.   It's fine with me.

24            MR. DUHAMEL:  Very good.  We're off the

25   record.

40

1                    (A recess was held at 10:31 a.m., and

2    proceedings resumed at 10:37 a.m.)

3                    MR. DUHAMEL:  Let us go back on the

4    record, please.

5        Q.    (BY MR. DUHAMEL)  Doctor, I want to make

6    sure that I understand the substance of your expert

7    report, so I'm going to ask a few specific questions

8    about what's contained in it.

9        A.    Very good.

10       Q.    Does your expert report express any opinion

11   as to whether any person has, in fact, been exposed

12   to any toxic substance from the plant located at

13   Carlisle Engineered Products facility?

14       A.    As we discussed before the break, my role

15   in this and what I provided an expert opinion on was

16   the nature of the toxic properties of those

17   compounds.  And it's my understanding that there are

18   other experts that were retained to provide

19   information on hydro-geology and on pathways and

20   transport from the facility.  And that would be

21   Bruce -- Dr. Bruce Bell and Dr. Julie Wetherington-

22   Rice, so that was not what I was asked to provide an

23   opinion on.

24       Q.    So just to be clear, your report does not

25   express any opinion on that subject?

1          A.    I did not evaluate the transport or the

2    fate of compounds from Carlisle, and so that's not a

3    part of my report.

4          **Q.    Okay.  Does your report express an opinion**

5    **as to whether or not conditions at the Carlisle**

6    **Engineered Products facility in Middlefield, Ohio,**

7    **constitute or may constitute an emanate and**

8    **substantial endangerment to human health or the**

9    **environment?**

10         A.    The array of compounds that are associated

11   with the facility and their toxicity and the notion

12   that there's the potential for multiple contact with

13   multiple agents is -- the full array of compounds is

14   such that it is of a concern to me that there are

15   unknown or unstudied compounds as to their presence

16   on the facility or their movement from the facility.

17   So, although I haven't looked specifically or

18   addressed in my report specifically the pathways, I

19   expressed the concern that given the array of

20   compounds that are there and their toxic nature, that

21   it is potential to pose imminent substantial

22   endangerment.

23         **Q.    Can you show me in your report where you**

24   **reach that particular conclusion?**

25         A.    I believe I said that I didn't specifically

42

1    put that in my report.  But what I did just state is

2    that, as I look at the list and I consider their

3    toxic effects, there's an array of very toxic to

4    potentially -- or moderately to very toxic compounds

5    present at this site.  And I'm concerned that these

6    compounds and their fate has not been apparently

7    addressed in terms of considering the potential to

8    cause harm to the public health.

9         Q.    I'm going to try again, because I think

10   maybe we're misunderstanding each other, Doctor.

11             Just to be completely clear, I'm not asking

12   you at all about what your current concerns or

13   opinions may be.  What I'm asking you is specifically

14   about what opinions you actually expressed in your

15   report.

16             So my question again is, does your report

17   express any opinion on that subject?

18        A.    I could point you to Page 9 at the bottom,

19   Comment on the Toxicity of Mixtures.  "The toxic

20   profiles of the above compounds represent a synopsis

21   of their effects when exposure occurs individually.

22   Because of the nature of the chemicals discussed

23   herein, it is likely that additive and synergistic

24   effects would occur with combined exposures to these

25   and other chemicals released from the Carlisle

43

1    facility.  Further, exposures to the chemicals herein

2    occurring via multiple routes (i.e., inhalation,

3    ingestion, dermal) would likely lead to greater

4    toxicity than by one route of exposure for one or

5    multiple compounds."  So that would be the place

6    where I'm referring to this issue of exposure to

7    multiple compounds which may have additive or

8    synergistic effects.

9         Q.   I understand.

10            Does the -- let me put it this way.  Does

11   the phrase "imminent and substantial endangerment"

12   appear anywhere in your report?

13        A.   No.

14        Q.   In Item D where you include Comment on the

15   Toxicity of Mixtures, do you express anywhere in your

16   report any opinion as to the likelihood of actual

17   exposure to -- let me start again.

18            Does your report in any way express an

19   opinion as to how likely it is that any person will

20   be exposed to contaminated groundwater around the

21   Carlisle Engineered Products facility?

22            MR. ALTMAN:  Objection.

23        A.   No.  My report stands as it is.  And as I

24   pointed out before, there were other experts,

25   Dr. Bell and Dr. Wetherington-Rice, that I understood

1    offered opinions as to those points that you raise.

2        Q.   But your report doesn't raise or does not

3    offer an opinion on that subject?

4        A.   On the subject of transport from the site,

5    no.

6        Q.   And on the subject of exposure by any

7    individual or group of individuals?

8                    MR. ALTMAN:  Objection.  That's been

9    asked and answered.

10                   MR. DUHAMEL:  You know what?  It has.

11   I'll withdraw the question.

12       Q.   (BY MR. DUHAMEL)  Doctor, have you been

13   asked to provide a supplemental expert report?

14       A.   No, I have not.

15       Q.   Did Mr. Altman or any attorney at

16   Mr. Altman's firm send you a written engagement

17   letter?

18       A.   Can you clarify what you mean by "a written

19   engagement letter"?  That's not a term that is

20   familiar to me.

21       Q.   All right.  Let's put it this way.  When

22   you were first asked to serve as an expert in this

23   case, were you asked orally or in writing?

24       A.   Orally.

25       Q.   Did Mr. Altman or any attorney in his firm

1    ever send you a letter, indicating what they had

2    asked you to provide an expert opinion on?

3        A.    That was done orally.

4        Q.    Did Mr. Altman or anyone in his firm ever

5    ask you if you could provide an opinion on the

6    subject of imminent and substantial endangerment?

7        A.    You mean as a part of the report?

8        Q.    Yes, sir.

9        A.    No.

10       Q.    Okay.  Can we just turn to Page 2 of your

11   report, the substitute page?

12       A.    (Witness complied.)

13       Q.    Looking at the very first substance that

14   you address, trichloroethylene, do you see that?

15       A.    Yes.

16       Q.    There is a reference to the EPA having

17   established an MCL in drinking water.  Do you see

18   that?

19       A.    Yes.

20       Q.    What's an MCL?

21       A.    It's a maximum contaminant level.

22       Q.    Do you know what the purpose of an MCL is?

23       A.    Yes.  An MCL provides a benchmark by which

24   we judge when there's excessive contamination of the

25   medium, the water, from the standpoint of what's safe

1   for the public.

2       Q.   Do you know if the EPA has ever determined

3   that exposure to trichloroethylene in drinking water

4   in an amount greater than five parts per billion is

5   actually unsafe?

6       A.   The establishment of health-based standards

7   consider an array of aspects of a risk assessment

8   process.  They consider the toxicity of the compound.

9   In some cases, they consider other potential

10  compounds that might be -- one might face exposure

11  along with that compound.  They use animal data,

12  human data.  They draw from an array of sources of

13  information to determine a level that would provide

14  an ample protection of the public for the particular

15  substance that is being -- for which the MCL is being

16  established.

17      Q.   Would you agree with me that that does not

18  necessarily mean that the EPA has determined that an

19  actual exposure at, say, six parts per billion is, in

20  fact, unsafe, but merely that, instead --

21              MR. ALTMAN:  Objection.

22      Q.   -- instead, as a matter of policy, the EPA

23  will set screening limits of five parts per billion?

24              MR. ALTMAN:  Objection as to form and

25  substance.

47

1          A.    Standard setting is a process of evaluating

2     the risks of a particular compound or suite of

3     compounds and trying to identify a reasonable level

4     that will protect the public, and when you're talking

5     about protecting the public, it means the majority of

6     the public.  And so one has to recognize that there

7     might be individuals within the public who are more

8     susceptible by virtue of genetics, age, gender, other

9     exposures that they have concurrently, personal

10    lifestyle factors and the like.  And so these

11    standards provide that consideration, to provide an

12    overall measure of public health protection.  So

13    these don't derive solely from a dose response type

14    of argument in a selected subgroup of the population.

15         Q.    Your next sentence, "The NTP has stated

16    that trichloroethylene is Group 2A, reasonably

17    anticipated to be a human carcinogen," do you see

18    that?

19         A.    Yes.

20         Q.    Is there a specific dose over a specific

21    period of time at which the NTP has made that

22    determination?

23         A.    Generally, when the NTP or IARC, the

24    International Agency for Research on Cancer, makes a

25    determination as to which category or group of

1  carcinogenicity they put a compound into, they

2  consider a weight of evidence of all of the data that

3  are available, deriving from occupational health

4  studies, epidemiologic studies, community health

5  studies, animal studies, in some cases, cell culture

6  or mechanistic laboratory studies, and so they look

7  at all of that information and make a determination

8  as to whether the compound is a Group 1, a 2A, a 2B

9  and so forth.

10      Q.    **Respectfully, I don't think that answered**

11  **my question.**

12          **When the NTP determines that a substance is**

13  **reasonably anticipated to be a human carcinogen, is**

14  **the NTP expressing a statement about what level of**

15  **exposure to that substance is likely to result in the**

16  **development of cancer in human populations?**

17          MR. ALTMAN:  Objection.

18      A.    The NTP publishes a list of agents that

19  they have evaluated and as to their grouping, so

20  those that are known to be a human carcinogen or

21  reasonably anticipated to be carcinogenic become

22  listed compounds.  And when they are listed

23  compounds, then they have that designation, and it

24  is not -- a level for that is not set in the list.

25  That's their process.

1       Q.      Understand.

2               Do you express anywhere in your report

3       any opinion as to what level of exposure to

4       trichloroethylene is likely to result in the

5       development of cancer in a human population?

6                       MR. ALTMAN:  Objection.

7       A.      I have not done so, because these

8       compounds, typically one is not exposed to them one

9       at a time.  Rather, it's as a mixture.  And,

10      furthermore, it's not a one size fits all in terms of

11      the individual that is being exposed.  As I've stated

12      several times, there are susceptibility factors which

13      then determine, in effect, the toxicity of these

14      compounds or the effects that they're going to exert

15      on an individual.  So given the array of compounds

16      that we're considering, it's -- I don't feel that

17      it's particularly meaningful to look at an individual

18      compound and say something about, if you will, a dose

19      response for that individual compound.

20      Q.      All right.  Well, let's try it, then, with

21      the entire array of compounds which, if I understand

22      correctly, you address as a mixture only in Item D on

23      Page 9 of your report; is that correct?

24      A.      No.

25                      MR. ALTMAN:  Objection.

```
 1              THE WITNESS:  Sorry.
 2      Q.    (BY MR. DUHAMEL)  Where else do you express
 3   an opinion on the effect of these items as a mixture?
 4      A.    What I was about to say before the
 5   objection, throughout here, there is a consideration
 6   of mixtures that in many cases there are statements
 7   as the environmental degradation products of the
 8   particular compound that's being described.  And,
 9   hence, if there's degradation from the parent
10   compound to first one intermediate then another, then
11   another, clearly there would be exposure to that
12   suite of compounds in the environment, and so those
13   statements appear throughout the report.
14      Q.    Let's try it this way.  Does your report
15   address -- I'm sorry.  Does your report express any
16   opinion on the dose or amount of exposure to the
17   suite of substances you address that would be likely
18   to result in harm to human health?
19      A.    I'm sorry.  Can you restate or rephrase the
20   question for me, because I don't understand the
21   question?
22      Q.    All right.  Taking the entire suite of
23   exposure -- of substances --
24      A.    So by that, you mean all 23 compounds that
25   I've rendered information on?
```