1    Q.    **Absolutely.**

2    A.    Okay.

3    Q.    **Take all 23 of them.**

4    A.    And their degradation products that I've

5    mentioned?

6    Q.    **Absolutely.**

7    A.    Okay.

8    Q.    **Take all of them.**

9    A.    Yes.

10    Q.    **And consider it a mixture.  Does your**

11    **report express any condition as to what dose of**

12    **exposure to that mixture would be likely to result in**

13    **harm to human health?**

14            MR. ALTMAN:  Objection.

15    A.    The compounds in this report, some of them

16    appear in water; some of them might be carried in

17    windblown soil; some of them may be off-gassing from

18    soil, so there would be multiple routes of --

19    potentially multiple routes of exposure and

20    differences in terms of temporal and spacial

21    characteristics of the exposures.  So I would venture

22    to guess that it would be unlikely that one -- that

23    people living in different areas around the facility

24    could have exposure to exactly the same suite of

25    these mixtures.  So, therefore, it would not be

52

1  fruitful to try and identify a dose for each of these

2  together that would yield some sort of a hypothetical

3  outcome.

4      Q.  **Does your report express any opinion as to**

5  **the nature of any actual exposure to any of these**

6  **substances, separately or in combination with others,**

7  **that people are actually experiencing or are likely**

8  **to actually experience around the Carlisle Engineered**

9  **Products facility?**

10      MR. ALTMAN:  Objection.

11      A.  Throughout the report, it refers to the

12  haz- -- some of the hazardous effects that are

13  associated with these particular compounds, adverse

14  health effects that occur in community-exposed

15  individuals and occupationally-exposed individuals.

16  And because the nature of the exposures to those

17  living in the vicinity of the Carlisle facility

18  aren't fully understood, then it wouldn't be

19  appropriate for me to try to express an opinion with

20  regard to individuals or their exposures.

21      Q.  **When you say the exposures are not -- are**

22  **not fully understood, could you tell me what you mean**

23  **by that statement?**

24      A.  Yes.  There is -- there is evidence that

25  has -- or there is information in other reports

1    submitted as part of this case that suggest off site

2    transmission via groundwater, via air, via surface

3    water, via soil and -- however, my understanding is

4    that these have not been studied sufficiently in

5    order to establish clearly the exposures that are

6    occurring to those who live in the vicinity of the

7    Carlisle facility.

8        Q.   **And your report does not address that issue**

9    **directly; is that correct?**

10       A.   Well, my report, as I've said, articulates

11   with regard to the adverse health effects associated

12   with these compounds and occupational and community

13   health settings, and so that's clearly relevant to

14   the exposures that the people living in the vicinity

15   of the Carlisle facility would experience and,

16   therefore, the adverse health effects articulated,

17   that they may be at risk for those adverse health

18   outcomes.

19       Q.   **I don't think that's what I asked you,**

20   **Doctor.  Let's try it again.**

21       A.   Okay.

22            MR. ALTMAN:  Objection, argumentative.

23   Objection, argumentative.

24       Q.   **If I understood correctly, you told me that**

25   **there were some suggestions in some of the other**

54

1    **reports rendered by some of the other experts in the**

2    **case that there were some potential exposure**

3    **pathways, but that those exposure pathways have not**

4    **yet been sufficiently studied to determine whether**

5    **and to what extent people in the vicinity were being**

6    **exposed.  Is that correct?**

7              MR. ALTMAN:  Objection,

8    mischaracterizes the testimony.

9              MR. DUHAMEL:  Well, I'm asking him if

10   it's right.

11             MR. ALTMAN:  I'm objecting to what

12   your -- to your question.  It mischaracterizes the

13   testimony.

14        A.   So is there a question?

15        **Q.   There is.**

16             MR. DUHAMEL:  Would the court reporter

17   read it back, please?

18             (The reporter read the requested

19   portion of the record.)

20             MR. ALTMAN:  I'm going to have an

21   objection as to form and as to the

22   mischaracterization.

23             Go ahead, Doctor.

24        A.   So, there are other reports that speak to

25   what is known about the movement of materials and the

1    concentrations on site.  There's less information, as

2    I understand it, with regard to what is off site, but

3    there are -- the pathways are evident that there

4    is -- such that there would be exposure to the

5    materials from materials from the Carlisle facility

6    to those who live in the neighboring vicinity.

7        Q.   (BY MR. DUHAMEL)  Does your report -- I'm

8    **talking about your expert report -- address the**

9    **likelihood of actual exposure to any of these**

10   **products or substances that might be experienced by**

11   **anyone within the vicinity of Carlisle Engineered**

12   **Products?**

13       A.   The list of compounds comes from

14   materials -- lists of materials from the facility

15   that were -- that were used there.  They were

16   supplied to the facility.  They were in the waste

17   streams from the facility.  Therefore, given that

18   they were in use on the facility, there's the

19   potential for them to cause exposure off site and

20   then -- so that extent, that is -- that is an element

21   of my report, yes.

22       Q.   **Could you show me where your report says**

23   **that?**

24       A.   On Page 10, on the listing of information

25   considered in forming my opinion, there's No. 30,

1  No. 31, No. 32, No. 33 on Page 11.

2      Q.   That's the information that you considered.

3  Is there anywhere in your report where you expressed

4  the opinion that people are likely to be exposed to

5  any of the substances that you've identified in the

6  report?  I'm not asking about what other people may

7  or may not have said.  I'm asking, is there anyone in

8  your -- anywhere in your report where you express

9  that opinion?

10     A.   Well, I guess, to that I would say --

11          MR. ALTMAN:  Objection.

12          Peter --

13          THE WITNESS:  YES.

14          MR. ALTMAN:  Objection.  I think that's

15  been asked and answered.

16          Go ahead.

17     A.   I would say that it's implicit in the

18  report, because, obviously, these compounds that

19  I've -- that I've described the toxicity of in my

20  report were not picked out of -- at random.  They

21  were picked because they were compounds that evidence

22  suggests were on site, and there's -- and were either

23  in the waste stream, the supply stream or were

24  identified in sampling.  So the fact that these are

25  the ones that were selected as opposed to some other

1    random compound is because there was the potential

2    for exposure to these.  So it's the nature of the

3    report.  It's inherent in the report that those are

4    there for that reason, and, thus, it isn't something

5    that one would expect to explicitly state.

6              I mean, it says, The facts and opinions

7    about waste handling, storage, disposal practices,

8    fate and effects are provided by other reports.  This

9    summarizes the properties of certain chemicals used

10   by and/or released from the Carlisle facility.  So

11   that sentence demonstrates that these are picked

12   because they have the potential -- that they were

13   used by and have the potential for release or were

14   released from the Carlisle facility.  So I think the

15   answer to your question is, yes, if I understand your

16   question.

17             (A discussion was held off the record.)

18        Q.   (BY MR. DUHAMEL)  Doctor, had you read any

19   other expert reports at the time you prepared this

20   report?

21             MR. ALTMAN:  Objection.

22        A.   You said "have I"?  Do you mean "had I"?

23        Q.   Had, had, H-A-D.

24        A.   Yes.  Thank you.  Had I --

25        Q.   At the time you prepared this report.

58

1    A.    I don't believe I had.  I do not recollect

2  having read any other report at the time I did this.

3    Q.    And I notice that in Item 2, Information

4  Considered in Forming My Opinion, none of those

5  expert reports submitted by the Plaintiffs is listed;

6  is that correct?

7    A.    So there are two reports listed on Page 2

8  under No. 2, and they do not appear in the list on

9  Pages 10 and 11.

10    Q.    That's what I'm asking, and that's correct,

11  right?  They do not appear on the list on Page 11 --

12    A.    Yes, that's what I stated.

13    Q.    -- Pages 10 and 11?

14          Okay.  Doctor, at the time you prepared

15  your report, had you spoken to anyone at Bennett &

16  Williams Environmental Consultants?

17    A.    No.

18    Q.    At the time you prepared your report, had

19  you spoken to anyone at Carpenter Environmental

20  Associates?

21    A.    No.

22    Q.    Who supplied to you the list of substances

23  that you evaluated in your report?

24    A.    This -- these compounds were on a list

25  provided to me by Mr. Altman and his associates.

59

1      Q.    Have you -- let me rephrase.

2            Does your report contain any independent

3      assessment by you of the likelihood of exposure to

4      these substances by anyone around the Carlisle

5      Engineered Products facility?

6                  MR. ALTMAN:  Objection.

7      A.    I believe that that's been -- that you

8      asked me that already, and I've answered that.  This

9      refers to -- that the compounds are here because they

10     are used by or released from the Carlisle facility,

11     and that's what puts them on the list.  Therefore,

12     there's the potential --

13     Q.    I remember you said that.

14     A.    -- for exposure.

15     Q.    But what I'm asking you is whether you

16     independently have performed any actual assessment of

17     the likelihood of actual exposure to these products

18     or substances based on the way that they are

19     currently in existence at the facility?

20                 MR. ALTMAN:  Objection.

21     A.    Well, first of all, this report is not --

22     doesn't reflect what's currently there, because this

23     report came some time ago, as you know.  And in

24     addition, the report is based on the information

25     of -- that reflects the use of the materials at the

60

```
 1    facility and, therefore, having the potential to

 2    lead to exposures to individuals who live in the

 3    facility -- vicinity of the facility, so to that

 4    extent, the answer would be yes.

 5         Q.   All right.  Let's try it this way.  Other

 6    than the fact that somebody told you that these

 7    products, at least at some time, had been used at the

 8    facility, do you have any reason to believe, that is

 9    expressed in your report, that anyone is likely to be

10    exposed to these products around the Carlisle

11    Engineered Products facility?

12              MR. ALTMAN:  Objection.

13         A.   The items I pointed to earlier, the letters

14    and attachments between and to people at Carlisle

15    demonstrate that there was use of these materials and

16    in some cases demonstrates that there was exposure on

17    site, so the answer to your question would be yes.

18         Q.   Other than the fact that some of the items

19    on which you relied say that, does anywhere in your

20    report express an opinion on that subject?

21              MR. ALTMAN:  Objection.  This is

22    boarding on argumentative.

23         A.   As I stated, the -- what I was asked to do

24    and my role as an expert was to provide information

25    on the toxic properties of the compounds used by or
```

61

1    found at the site.  And there were other experts

2    offering opinions on fate and transport and

3    hydro-geology and movement of the compounds, so, you

4    know, I did just that.  And the compounds that I

5    list -- I talked about in the report or gave

6    information about in the report are in the report

7    because they were used at the facility and referred

8    to in various documents that are referenced therein.

9           MR. DUHAMEL:  Could the court reporter

10   read my question back?  And I'll ask the witness to

11   actually answer it.

12          MR. ALTMAN:  Objection.  Marcel, we're

13   going to at least take a break if you continue to

14   argue with the witness.

15          MR. DUHAMEL:  Well, we can take a break

16   after the witness answers my question.

17          MR. ALTMAN:  No.  What I meant was, we

18   may terminate the deposition if you continue to

19   badger the witness.

20          MR. DUHAMEL:  I'll ask my questions.

21          MR. ALTMAN:  Well, you're not going to

22   intimidate the witness.

23          MR. DUHAMEL:  I'm quite confident that

24   Dr. Thorne is not going to be intimidated by me.

25   However, I will ask my questions until they're

1 answered.

2             THE WITNESS:  And I'm doing the best to

3 answer the questions that you're posing to me, I can

4 assure you.

5             MR. ALTMAN:  Marcel, that's

6 disrespectful and uncivil.  And if you contrast the

7 honest way this man's been answering with the people

8 that have been put in front of me, it will be

9 astounding.

10             MR. DUHAMEL:  I'm not going to engage

11 in that on this transcript, but --

12             MR. ALTMAN:  Well, you're not going to

13 insult Dr. Thorne, who is an honest and straight-

14 forward man.

15             MR. DUHAMEL:  Nor have I suggested to

16 the contrary.  I'm going to ask the witness -- or,

17 rather, the court reporter to go back and re-read the

18 question?

19             MR. ALTMAN:  Marcel, I have a high

20 regard for you, but your questions have been almost

21 incomprehensible.

22             (The reporter read the requested

23 portion of the record.)

24     A.  So there's two "that's" in the question

25 that I'm not certain what they mean at this point, so

63

1    if you could rephrase your question or ask it again

2    in a more specific manner, I'd be happy to answer it.

3        Q.   (BY MR. DUHAMEL)  All right.  Let's try it

4    this way, Doctor.  I understand that you have told me

5    that some of the items upon which you relied in

6    formulating your report express the view that these

7    substances that are the subject of your report were

8    used at the facility.  Is that understanding correct?

9        A.   Yes.

10       Q.   I also understood from your testimony --

11   and please tell me if this is correct or a

12   mischaracterization -- that to the extent to which

13   you believe that people might be exposed to any of

14   those products or substances, it is because you know

15   them to have been used at the Carlisle Engineered

16   Products facility; is that correct?

17          MR. ALTMAN:  Objection as to form and

18   substance.

19       A.   So you're asking, at the time I wrote the

20   report and the information I had in my knowledge at

21   that time contrasted with what I know today?

22       Q.   Yes.  Absolutely.

23       A.   Okay.  So at the time I wrote my report, I

24   knew of the listed compounds.  I knew of the letters

25   that I've referred to several times.  I also knew

1    that there had been some soil sampling performed that

2    showed that there were compounds that are on --

3    contained within my report appearing at levels that

4    would not be expected in normal samples or

5    non-contaminated samples, so that was also a piece of

6    information that was part of my knowledge at the time

7    that I wrote this report.

8              Now, those were -- that's the best of my

9    recollection with regard to what I knew at that time

10   with regard to this case.  And, of course, this has

11   been a continuum.  The report was -- the report

12   authoring was at one time point along this continuum

13   of learning more of this particular case, but to the

14   best of my recollection, that's what I knew at that

15   time.

16        Q.   All right.  Then apart from listing the

17   sources of information on which you relied, does your

18   actual expert report -- as distinct from whatever

19   opinion you may currently hold, does your actual

20   expert report express any opinion as to the

21   likelihood of actual exposure to any of the

22   substances at or around the Carlisle Engineered

23   Products facility?

24        A.   Well, I would --

25              MR. ALTMAN:  Objection.

1      A.    I'm sorry.  I have to go back to the same

2   answer I've given multiple times, which is that these

3   compounds were used and -- in the waste products

4   streams from the facility and they -- these

5   compounds, by their very nature, have the potential

6   to move in the environment.  And so with that

7   knowledge, one has to consider the possibility that

8   people in the vicinity of the facility would have

9   exposure.  And looking at the transmissions and the

10  correspondence in these particular letters that I've

11  pointed to, it's reasonable to consider that that

12  would be a possibility.  So, I guess, it's a

13  qualified yes to your question as stated.

14      **Q.    And what I'm specifically trying to**

15  **understand, Doctor, is not what opinion you have**

16  **right now.  Where in your report does it express that**

17  **view?**

18              MR. ALTMAN:  Objection.

19      A.    So I would point again to my comments under

20  Section D that we've talked about, and then I

21  would -- I would point to the fact that this --

22  Page 2 under No. 2, that the report summarizes the

23  toxic properties of chemicals used by and/or released

24  from the Carlisle facility.  So those are the places

25  where I refer to that.

1      Q.    Nowhere else?

2      A.    And then as I stated, it's implicit in the

3 inclusion of these particular compounds on the list.

4 They wouldn't be on the list if there wasn't a reason

5 for it.

6      **Q.    All right.  Is the list of the chemicals**

7 **that was supplied to you by someone at Mr. Hodgins'**

8 **(sic) law firm, is that identified on Item 2 on**

9 **Page 10?**

10      A.    When we -- when you asked me about

11 getting -- the inclusion of compounds, I believe I

12 told you that some of the compounds were on a list,

13 and I also point to compounds that were contained in

14 these letters that I've referred to from the -- that

15 represent company documents, so there isn't a list,

16 per se.  There was some compounds that were of

17 interest to Mr. Hodgins' firm, and then there were

18 compounds that were referred to in these particular

19 letters and correspondences.  And so all of that

20 together became sort of a precursor to the compounds

21 that are actually listed here, which is a subset of

22 those other listings of compounds; both those that I

23 came up with and those of others -- of the law firm,

24 so there isn't a --

25      **Q.    But I understand there was a list --**

1              MR. ALTMAN:  Objection.  Marcel, let

2     him finish.

3              MR. DUHAMEL:  I was trying.

4              MR. ALTMAN:  Go ahead and finish,

5     Peter.

6         A.   Okay.  This -- so what's represented here

7     is the list of compounds in my report.  There is no

8     other list of compounds in my report other than what

9     you see before you in Exhibit 1.  Now, there was a

10    more extensive list of an array of compounds that I

11    considered in -- to include in my report, and that

12    was drawn from my own investigations with regard to

13    looking at these documents I've referred to as well

14    as compounds that were of interest to Mr. Altman

15    based on his review of company documents.  Those --

16    in some cases, there were duplication between the

17    various sources of information.  All of that, then, I

18    took and came up with a list that is what you see in

19    the report here.  That is the list that is reported

20    on.

21        Q.   (BY MR. DUHAMEL)  Doctor, it is true, isn't

22    it, that someone at Mr. Altman's law firm sent you a

23    list of substances in which they were interested?

24        A.   Yes.

25              MR. ALTMAN:  Objection.

1      **Q.   Does that list appear anywhere on your**

2   **report as an item on which you relied in any way?**

3      A.   Well, first of all, I mean, there was not

4   a list, per se.  What there was in our correspondence

5   was some compounds of interest, in some cases

6   compounds that have alternative names, alternative

7   spellings, and then that was some compounds that

8   Mr. Altman's firm apparently had decided were of

9   interest to them.  Many of those were also compounds

10   identified in my viewing of the documents that I've

11   referenced in my list, and so it's a host of

12   different compounds deriving from different sources.

13      **Q.   Doctor, did the list or any listing that**

14   **Mr. Altman's law firm sent to you appear anywhere on**

15   **your report as an item on which you relied in any**

16   **way?**

17          MR. ALTMAN:  Objection.

18      A.   I have not listed in the listing of sources

19   information considered in forming my opinion.  I have

20   not listed a list of candidate compounds or compounds

21   of interest to Mr. Altman among that list, so, no, it

22   isn't listed in information considered in forming my

23   opinion.

24      **Q.   Are any of the substances which you**

25   **addressed in your opinion -- in your report**

1  substances you addressed because Mr. Altman asked you

2  to do so?

3      A.   I don't know the answer to that, because I

4  would have to look specifically at which compounds

5  derived from what sources, which letters and so

6  forth, and that's not something that I have

7  endeavored to do.

8      Q.   So if I understand correctly, sitting here

9  today, you would not be able to go through your

10 report and identify the substances that you studied

11 because you saw through documentation that they were

12 being used at the plant as distinct from documents or

13 substances that you studied because Mr. Altman's firm

14 asked you to study them?

15          MR. ALTMAN:  Objection.  There's been

16 testimony on that.  That's misleading, inaccurate,

17 and I object to the form.

18     A.   Sitting here right now, I do not know which

19 compound came from which source, the letters and

20 attachments, the correspondence, and which, if any,

21 were on -- were suggested as compounds to be

22 considered by Mr. Altman.

23     Q.   Do you still possess correspondence from

24 Mr. Altman, indicating which compounds they would

25 like you to look at?

1   A. I don't believe so.

2   **Q.** **When did you dispose of that?**

3   A. I don't know.  Generally, when I create a

4 report such as this, notes such as, you know,

5 candidate substances to consider are something I

6 don't keep.

7   **Q.** **So would there be any way to reconstruct**

8 **the source of your information with respect to any of**

9 **the substances on your report?**

10   A. I believe there would be, and that would be

11 to see -- to look through carefully the letters and

12 attachments that are referred to in the list of

13 information considered in forming my opinion and then

14 to endeavor to determine if there are any compounds

15 that I've provided in my report -- included in my

16 report that were not in any of those documents.  So

17 it would be something that would be done by

18 exclusion.

19   **Q.** **And what would we be able to determine by**

20 **that process of exclusion?  In other words, if we**

21 **were to look at the items on Page 10 and determine**

22 **what substances exist on that -- on those documents**

23 **and then determine that your report addressed**

24 **additional substances, what would that tell us about**

25 **the source of your information concerning those**

1    additional substances?

2              MR. ALTMAN:  Objection.

3       A.   I would -- I would think that that would

4    indicate that those compounds were included as an

5    outgrowth of my discussions with Mr. Altman's --

6    Mr. Altman and his associates.

7       Q.   **Other than your expert report and the items**

8    **listed on Page 10, moving on to Page 11, do you have**

9    **any other documents in your possession that relate to**

10   **this engagement?**

11      A.   I have an interim accounting of my time

12   spent on the case and a bill that I submitted to

13   Mr. Altman's firm.

14      Q.   **Anything else?**

15      A.   You say in relation to the engagement.  As

16   I understand what you're asking, that would be all.

17      Q.   **Well, let's be clear.  When I say --**

18              MR. ALTMAN:  Wait a minute.  Marcel,

19   why don't you explain to him what you mean by -- you

20   mean in connection with the services he performed,

21   right, so far?

22              MR. DUHAMEL:  Yes.  I was attempting to

23   do that, David.

24              MR. ALTMAN:  Go ahead.

25      Q.   **(BY MR. DUHAMEL)  All right.  Let's be**

1  clear.  When I say "engagement," I mean -- I don't

2  mean the specific terms of your engagement.  I mean

3  the services you rendered.  Do you have any documents

4  related to the performance of your expert services in

5  this case?

6      A.   Yes.  And now you're talking about --

7      Q.   Other than the ones you just described?

8      A.   Yes.  You're talking about now, correct,

9  meaning at this point in time as opposed to when the

10  report was written?

11      Q.   I'm talking about at the time the report

12  was written.  Let me give you a few examples of what

13  I'm asking about.  We'll try it this way.

14      A.   Okay.

15      Q.   Do you have any notes reflecting any of

16  your work that ultimately led to your report?

17      A.   At the time of my report?

18      Q.   Well, I'm talking about work that led to

19  your report, so presumably if you have notes that

20  were generated after, they couldn't have led to your

21  report.

22      A.   Correct.  But I may have had notes at the

23  time I wrote my report that I no longer have.

24      Q.   Okay.  That's a fair question.

25           Were there at any time documents related to

73

1      **this engagement that you had that you no longer have?**

2           A.    Yes.

3           **Q.    What documents were those?**

4           A.    Those would be notes that I make along the

5      way with regard to reading the scientific and

6      toxicologic literature, notes that I make that are

7      relevant to the generation of the report.

8           **Q.    Would there be anything else?**

9           A.    There would have been -- I probably would

10     have at that time notes regarding -- that I would

11     take in conversations with Mr. Altman regarding

12     the -- you know, the report in terms of what he was

13     asking me to investigate in terms of, you know,

14     providing an opinion as to the toxic com- -- nature

15     of the compounds that I was investigating.

16          **Q.    Do any of those notes still exist?**

17          A.    I don't know.  I would have to check.

18          **Q.    How about correspondence exchanged between**

19     **you and Mr. Altman's law firm?**

20          A.    There -- again, you're referring to at the

21     time I wrote the report, not now, correct?

22          **Q.    What I'm referring to is, were there**

23     **documents that you exchanged between yourself and**

24     **Mr. Altman's law firm or vice versa as of the time**

25     **you wrote your report or prior?**

1     A.   Yes.  Those listed under Nos. 30, 31, 32,

2    33 in the report, and there would probably be a -- or

3    possibly be a cover letter saying, "Please find

4    herein" da, ta, da, ta, da.

5     **Q.   Would Mr. Altman's law firm have sent you**

6    **any other correspondence?**

7     A.   Possibly correspondence to schedule a

8    telephone discussion that would come -- the type that

9    would be arranged through a secretary.

10     **Q.   Any other kind of correspondence?**

11     A.   Not that comes to mind.

12     **Q.   I want to ask you now about what you**

13    **currently have in your possession.**

14     A.   Okay.

15     **Q.   Other than the expert report, the interim**

16    **time record that you mentioned and the items listed**

17    **on Pages 10 to 11 of the report itself, do you have**

18    **any other documents related to the work that you**

19    **performed for the Plaintiff in this case?**

20     A.   Yes.  I -- would you like me to list them?

21     **Q.   Could you tell me what those documents are?**

22     A.   Yes.

23     **Q.   Yes, please.**

24     A.   I have the report of Dr. Bruce Bell;

25    although, I don't -- I'm not certain I have all of

1    the appendices with that.  For instance, I don't

2    believe I have his CV.  Similarly, I have the report

3    of Julie Wetherington-Rice.  I have the report of

4    Dr. Richard Lewis.  I have part of a summary area

5    investigation that I believe is from a firm called

6    Cox & Colvin.  I have a transcript of the deposition

7    of Dr. Lewis.  I have some notes I've taken and

8    perhaps some toxicologic profiles from the ATSDR,

9    Agency for Toxic Substances and Disease Registry,

10   that are drawn from their -- they post those on their

11   Internet site.  And then if I've done reading in

12   toxicologic texts that are referenced, for instance,

13   the Casarett and Doull toxicology book, I believe, I

14   have some notes that I recorded when reading from

15   that text.

16        Q.   Are those all things that came into your

17   possession after the time you produced your expert

18   report in this case?

19        A.   Yes.

20             MR. DUHAMEL:  Okay.  It's a quarter to

21   1:00.  I propose we take a five-minute break.  I'm

22   going to review my notes.  I think we are nearing

23   completion.

24             THE WITNESS:  Okay.

25             MR. DUHAMEL:  Let's just take five